LEIGH M. CLARK, Retired Circuit Judge.
A jury found Nathaniel Davis guilty of the murder of Charlie Mae Ruggs by shooting her with a pistol. He was sentenced to life imprisonment.
Although no issue is presented on appeal as to the sufficiency of the evidence to sustain the verdict of the jury, we think it helpful and appropriate to quote the first paragraph of the statement of facts contained in appellant’s brief, as follows:
“On April 22, 1982, Charlie Mae Ruggs was driving alone in her automobile along Riverside Drive in the City of Montgomery, Montgomery County, Alabama, when her car was forced to halt by another vehicle. She was shot in the face by an unknown black male assailant who then got back into his vehicle and left. Witnesses testified that they witnessed the shooting of the decedent by this unknown assailant. Even though it was dark and he had only seen him a few times, a witness for the State, Robert Banks Johnson, identified the assailant to the police as Nathaniel Davis, who was his rival for the victim’s romantic attentions.”
We deem it unnecessary to recite further evidence in the case, other than the evidence pertinent to one or more of the three issues presented by appellant, which we now consider in the order of their presentation in appellant’s brief.
I.
Appellant urges error in the admission of testimony of Robert Johnson as to what the victim had told him at or just outside of the residence of the witness a short while after dark on the night of April 22, 1982, the night the victim was killed. Appellant refers particularly to that part of the testimony of Johnson in which he said that the “victim came over to his home to return some of his [Johnson’s] clothing because of threats made by the Defendant to her” and that the victim then said she was “breaking off their relationship [the relationship between the victim and Johnson] because the Defendant had made threats to come and shoot her if she did not.” The core of the evidence to which the objection was made is the following portion of Johnson’s testimony on direct examination:
“Q. Tell us what she said to you as why she was bringing your clothing back to you?
“A. She said to me she was bringing my clothing back because of the threats made by Nathaniel Davis. She wouldn’t want him to come over there and shoot her in her house and hurt her children or me or anybody. So, that’s why she was bringing my clothes and we break the relationship.
“Q. And we do what now?
“A. Break our relationship and keep out of trouble.
“Q. After you finished discussing talking about this, did she leave?
“A. Yes.”
*215 Johnson continued to testify by stating that as he and the victim were going out of his house, the victim said to him “There is his car up there,” and I said, “Oh, that’s not his car. That car has been sitting there all day.” According to Johnson, the two proceeded to walk onto the sidewalk, where the victim got in her car. The witness continued his testimony on direct examination, as follows;
“Q. What happened after she got into her car?
“A. She turned around in the street. Made a U-turn from where she was sitting, and started backing around the corner.
“Q. Did you stand there or did you leave or did you see her car leave? “A. I saw her car leave and I watched it and I was walking — I turned around and started walking back toward the house and I saw this Cadillac come up behind with his lights off, bumped her car. Then I knew that was him.”
The witness continued his testimony on an additional page of the transcript as to what he observed and heard, and then testified:
“A. I got out to the next street, yes. “Q. And what, if anything, did you see when you got out on the next street? “A. I got out there in time to see this — I don’t know how I should say it. Nathaniel Davis walking off of the curb, pulling on the right side of her car which was locked.
“Q. You saw him pull in on the right side of her car?
“A. The right side of her car door which was locked. He went back around the car and come onto the side she was on. Her glass—
“Q. Go ahead on.
“A. The glass was cracked about an inch and as he was walking up to the car he said something like get out of the car; I am going to kill you. And, I continued on crossing the street and was standing on the porch on the other side.
“Q. Let me ask you this: When you were watching this, did you go up on Nathaniel Davis?
“A. Not — because I saw what appeared to be a gun in his hand.
“Q. You saw this where?
“A. No, I didn’t go up on him because I saw what appeared to be a gun in his hand.
“Q. Did you ever see or hear any gun shots out there?
“A. Yes, I did.
“Q. How or when did you see this? “A. When I crossed the street on the other side, he was — I heard the gun shot. In fact, I saw sparks from the gun as he had it sticking down in the cracked glass on her side. She looked up screaming. Milk [nickname for defendant, as shown by other witnesses], please don’t shoot me, and he shot her right in the face, I swear.”
Immediately prior to the testimony of Johnson, as above quoted, and immediately after defendant’s counsel objected to the proffered testimony as to what the victim told Johnson, a hearing was conducted out of the presence of the jury, in which counsel for the State and counsel for defendant presented to the court long arguments pro and con as to the admissibility of the evidence. The trial court agreed, and we agree, with the position taken by counsel for the State that it was admissible as part of the “res gestae” of the victim’s dissolution a mensa et thoro of the relatively recent relation between her and the witness, and the removal of incriminating evidence thereof, out of fear from one who had previously enjoyed a similar relation with her, as explained by the victim while she was in the process of severing relations with the witness. Although what the witness said the victim stated to him was hearsay, the particular testimony did not go beyond an explanation for the conduct of the victim at the time and place the victim verbally explained her conduct to the witness. Our conclusion finds adequate support in Hayes v. State, Ala.Cr.App., 395 So.2d 127, 142-144, writ denied, 395 So.2d 150 (1981), in which Judge Tyson comprehensively covered the subject with citation to and quotations from other authorities *216 which, when fully considered, are also supportive of the conclusion we now reach, that the testimony of the witness as to what the victim said to him a few minutes before she went to her automobile and was almost immediately thereafter killed was admissible in evidence.
II.
In presenting evidence for the State, its counsel pursued an inquiry as to who was driving the automobile that ran into the victim’s automobile a few moments before the victim was shot and killed therein while she and the automobile she was driving were in the immediate vicinity of where the other automobile had collided with the motor vehicle she was driving. In doing so, the State utilized the services of a criminalist in the area of forensic sciences, Thomas Hopen, an employee of the Alabama Department of Forensic Sciences, specializing in the area of trace-evidence. Mr. Hopen testified that he had made a studious and meticulous comparison between paint scrapings that had been identified by other witnesses as paint that had been taken from the Cadillac automobile being driven by defendant just before the victim was killed and paint scrapings that had been taken from the Ford automobile in which the victim was sitting just before and at the time she was killed. According to witnesses who had taken or identified the scrapings, they consisted of original or factory paint from each automobile and some scrapings of paint from one of the automobiles that had apparently . been transferred thereon by means of a collision between such automobile and another automobile. The attorneys and the court and all the witnesses concerned seemed to fully understand and differentiate the numerous pertinent exhibits and their contents, but we are not able to understand them fully, which is largely by reason, we think, of references in the transcript by body language instead of words, numbers or letters. However, this does not prevent an understanding of the issue raised on appeal, which is as to the admissibility of the testimony of Mr. Hopen to the effect, apparently, that some of the original paint taken either from the victim’s automobile or from the defendant’s automobile could have had the same origin as the paint that had been transferred thereon from some other automobile as a result of a collision between two automobiles. Appellant’s specific contention as to this evidence is that, “Qualifying Mr. Hopen as an expert witness concerning paint samples was in error.”
According to the undisputed evidence, Mr. Hopen had received a B.S. degree in chemistry from Southeast Missouri College, and a master’s degree in criminal justice from Auburn University in Montgomery, had spent three years working in a crime laboratory in Missouri, and had been with the Alabama Department of Forensic Sciences since June of 1974. Furthermore, according to his testimony, his experience as a trace-evidence coordinator included the following:
“Q. When was the last such occasion that you had an opportunity to examine and exchange information with experts from foreign countries?
“A. The last time that I did any out-of-state consulting is when I was asked by the State of Georgia to come over as part of a scientific team to review the evidence on the Wayne Williams case and to render an opinion as to that evidence. “Q. And you were one of how many experts that were called in?
“A. I was one of sixteen experts called in from the United States and Canada. “Q. That would be throughout the United States; is that correct?
“A. That’s correct.
“Q. And Canada?
“A. And Canada.”
The fact that Mr. Hopen was a criminalist does not per se qualify him as an expert witness as to the matter as to which he did testify in this case, but all of the evidence pertaining to his qualifications as an expert witness as to the subject of his testimony was more than enough to qualify him to testify as an expert on such subject. The *217 court was correct in overruling defendant’s objection on defendant’s asserted ground to the contrary.
III.
In testifying in his own defense, Nathaniel Davis emphatically denied he killed Charlie Mae Ruggs and insisted that he was not in the vicinity of the place she was killed on the night she was shot to death. He said he last saw “Miss Ruggs” about “4:30” or “quarter to five” P.M. on the date of her death. During the cross-examination of defendant, the State was permitted, over the objection of defendant’s attorney, to show that defendant was convicted in 1958 in Montgomery County Circuit Court of an assault with intent to murder. Appellant does not question the soundness of the proposition that an assault with intent to murder involves moral turpitude and that a conviction therefor of a witness may be .shown on cross-examination of a witness in impeachment of the witness. Roden v. State, 5 Ala.App. 247, 59 So. 751 (1912). He contends, however, that the plea of guilty upon which the judgment of conviction of an assault with intent to murder was interposed was not “voluntarily and intelligently made” and that on authority of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), it was an invalid judgment. The heart of his contention that it was invalid is to be found in the following paragraphs of appellant’s brief:
“In. 1958 the Defendant, a black man, was on trial in Montgomery County during a time in which juries were composed of all whites. It was the practice of a particular judge at that time to grant probation only on a guilty plea. If the ease went to trial and the defendant was found guilty, he would receive an automatic prison sentence. The Defendant in this case was forced to choose between a guilty plea and the certainty of probation or waiting to take his chance with an all white jury. While there may have been no visible, external pressure put upon a black defendant at that time, there was certainly a great deal of mental coercion placed upon him. Based upon these facts, a guilty plea at that time could hardly be construed as voluntary.
“While the Defendant cannot now claim that in 1958 he was deprived of the constitutional rights to his entry of a guilty plea, he can attack that plea by showing that it was not voluntarily and intelligently made. Certainly the surrounding circumstances at the time he made the guilty plea are relevant to show the state of mind of the Defendant and the mental coercion which was placed on him by the sentencing practices of the judge and the racial makeup of the jury. A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act is void. A conviction based upon such a plea is open to collateral attacks. Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962).”
The issue now under consideration was raised also on the trial of the case, at which time a detailed inquiry was made out of the presence and hearing of the jury as to the 1958 conviction of an assault with intent to murder, in which it developed that the same attorney representing defendant on the trial of the instant case and on this appeal represented him in 1958 in the case in which he was adjudged guilty on a plea of guilty, sentenced to imprisonment for two years, and placed on probation. Said attorney made the following statement in support of his contention that the judgment of conviction for assault with intent to murder was void and could not be shown in evidence by the State in impeachment of defendant as a witness in the instant case:
“I am inclined to state for the Record the ground that occurs to me now, and I have to confess to Your Honor that I can’t cite any authority for it, but I feel I should make an attempt to either preserve every error. I would object to it on the ground that, and I think the Court could judicially know that in 1958, when this conviction occurred and the record which I don’t think or anticipate the Record is going to be in evidence, but the *218 record has been presented to the Court and I would like to make it a part of the Record. Certainly, not to go to the Jury. There was a different climate here in the courthouse as Your Honor well knows. People could make agreements for probation in advance. It was more difficult for a black man to defend himself because we had all white juries in those days and I think that I would want to suggest to Your Honor that his plea of guilty should not be admitted because of the circumstances that existed back at that time that would have compelled him to enter a plea of guilty in exchange for a pre-trial arrangement for probation. You know, it was Judge Carter’s [the trial judge in the assault with intent to murder case] practice frequently to let you try a case in advance and tell you what he would do with it, and I certainly don’t criticize him for that. Sometimes, it worked out to our advantage. Sometimes it didn’t. It just depended on the cases, but I would like to state that.
“The Court obviously excluded blacks from juries in those days and that affected the choices that a black man had in deciding how to defend himself or whether to try his case before an all white jury and take a chance on what their verdict might be.”
The issue manifests commendable ingenuity and resourcefulness by appellant’s counsel. However, neither Machibroda v. United States nor any other authority cited by appellant supports the position now taken by appellant to the effect that the judgment finding him guilty of assault with intent to murder and sentencing him to imprisonment for two years and placing him on probation is void for the reasons set forth by appellant’s counsel. Machibroda v. United States was a federal habeas corpus proceeding in which the Supreme Court was dealing with constitutional rights of one who was still serving a sentence and by the particular proceeding was contesting the validity of the judgment of conviction and sentence. The case is inapposite to the instant case.
The instant case is distinguishable from Machibroda, supra, not only procedurally, as we have just noted, but also substantively, which we now consider. In the cited case, it was determined by the Supreme Court that the previous judgments of conviction and sentence in Machibroda, based on the defendant’s pleas of guilty, were subject to challenge by the verified petition filed in a federal district court in which there were detailed assertions of fact, as distinguished from mere opinions, conclusions, or arguments, which, if true, would have clearly shown that his pleas of guilty were not voluntary. The United States attorney countered with affidavits to the contrary. The District Court denied Ma-chibroda’s petition without a hearing. At 368 U.S. at p. 493, 82 S.Ct. at p. 513, 7 L.Ed.2d p. 478, Justice Stewart, with four Justices concurring, stated:
“There can be no doubt that, if the allegations contained in the petitioner’s motion and affidavit are true, he is entitled to have his sentence vacated. A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void. A conviction based upon such a plea is open to collateral attack....”
In the case cited, is to be found a trail of alleged deceptions practiced against Ma-chibroda that resulted in the interposition of the plea of guilty. In the instant case, there is no such contention, and, even if there were, it would consist merely of argument that counsel for appellant has .made in this Court and in the trial court. The circumstances narrated by counsel in both courts indicate, irrespective of all other portions of the argument, not only that defendant’s plea of guilty was voluntarily, intelligently, and understanding^ interposed, but also that almost certainly such plea was to the best interest of defendant, in whatever forum the case was pending, whether in Montgomery, Alabama, or any other city in the United States of America. Although not necessary to a proper determination of the case under consideration, it is to be noted that, in contrast to the posi *219 tion taken by defendant-appellant through his counsel in the instant case to the effect that he could not have obtained a fair trial before a jury in Montgomery County in 1958, is the following portion of his counsel’s statement in the sentence hearing in the instant case:
“For assault with intent to murder which, I guess, this means May 26th, 1958, was the date he was convicted. I represented Mr. Davis at the time. There were two charges made against Mr. Davis at that time. One murder charge and one assault with intent to murder charge. The fact of the case, and I’ll have Mr. Davis testify to this if the State won’t accept what I have to say, based on my investigation of it. There were two men to pick the argument with Mr. Davis at that time and both of them pulled knives on him. He attempted to retreat, went to his truck which was parked, I guess, maybe a hundred feet away. They followed him. He had a shotgun in his truck. When he got to the truck these men were still following him, so he got the shotgun and shot both of them. The State tried him. One of them died and one of them did not die. The State tried him on the murder charge involving the one who did die. He was acquitted. They were still pending against him, at that time, an assault with intent to murder charge. Judge Eugene Carter presided over all criminal trials in this Circuit and Judge Carter had a rule that he would not grant probation to a defendant who did not enter a plea of guilty. That rule was not tested and not changed for some time after that. Also, at that time, it was possible to make an agreement in advance if the defendant would receive probation and Mr. Davis, through me, was offered an opportunity to plead guilty to the assault with intent to murder charge and was assured he would get probation. In view of Judge Carter’s rule that he would not receive probation if he didn’t enter a plea of guilty, he couldn’t afford to do otherwise. It was on that basis that he did plead guilty. I would further state the grounds that I introduced at the trial of this present case in opposition to the record of his prior conviction, that there was at that time a systematic exclusion from blacks in Montgomery County. The opportunity for Mr. Davis to have a fair trial was much less than it is now. So we offer that, those facts, as a ground for objection to his being treated as an habitual offender. Further, we point out to the Court that the conviction was what, almost twenty-five years ago and certainly that part does not, as a matter of fact, show a habitual offender. So we would object to the Court treating him as an habitual offender in this case.”
We find no satisfactory explanation of the verdict of a jury finding this appellant not guilty of murder of a person he had shot and killed, in an encounter with two men in which he had shot the other man also but failed to kill him, consistent with appellant’s contention now under consideration that defendant could not have obtained a fair trial in Montgomery County, Alabama, in 1958 before a jury on an indictment charging him with an assault with intent to murder the man he had shot but failed to kill. The trial court was not in error in permitting the State to show in impeachment of defendant as a witness that he had been previously convicted of an assault with intent to murder.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.